WILLIE HUGH HOLLEY and ELEANOR R. HOLLEY, Plaintiffs in Error, v. NORMA FAYE TAYLOR, a Minor Suing by Father and Next Friend, JOHN A. TAYLOR, Defendant in Error.

WILLIE HUGH HOLLEY and ELEANOR R. HOLLEY, Plaintiffs in Error, v. JOHN A. TAYLOR, Defendant in Error. No. 2, Shelby Law. —381 S. W. (2d) 510.

Western Section at Jackson. April 27, 1964.

Certiorari Denied by Supreme Court July 15, 1964.

William I. McLain, Memphis, for plaintiffs in error.

Irving M. Strauch, Memphis, Strauch & Jones, Memphis, of counsel, for defendant in error.

John B. Thomason Memphis, amicus curiae.

BEJACH, J. This cause involves an appeal in error by Willlie Hugh Holley and Eleanor R. Holley, his wife, from judgments against them and Eugene Chaney and

Roxie Ann Chaney, his wife, in the Circuit Court of Shelby County, Tennessee, for $5,000 in favor of Norma Faye Taylor and $3,500 in favor of John A. Taylor. Although the judgment in the lower court was against both the Holleys and the Chaneys, the Chaneys did not perfect an appeal. It thus results that the cause in the Court of Appeals involves only the suits of Norma Faye Taylor, suing by next friend, and that of John A. Taylor, her father, against Willie Hugh Holley and Eleanor R. Holley. Mr. John B. Thomason of Memphis, Tennessee, who represented Eugene Chaney and Roxie Ann Chaney in the lower court, did, however, apply to this court for permission to file a brief, as amicus curiae, and argue the case, in an effort to obtain affirmance of the judgment against Willie Hugh Holley and Eleanor R. Holley. Such permission was granted, and Mr. Thomason did file a brief and did orally argue the cause.

The order in this Court granting permission to Mr. Thomason to file a brief and appear as amicus curiae was entered pursuant to a motion of Eugene Chaney and Roxie Ann Chaney made for that purpose, which motion was approved by counsel for both the Holleys and the Taylors. It contained, however, the following recital:

"Counsel for the Taylors has approved this motion. Counsel for the Holleys has also approved this motion but without waiving and expressly reserving his right to challenge the standing of the proponents Chaneys in this Court and their right to be heard in opposition to the assignments of error and brief of the said Holleys."

After the brief of Mr. Thomason was filed in this Court, a motion was filed to strike same, which motion was

argued at the hearing, and which motion we will dispose of before considering the cause on its merits.

■ Having consented to the motion for leave to file a brief as amicus curiae made by Mr. Thomason on behalf of Eugene Chaney and Roxie Ann Chaney, we think the motion of Willie Hugh Holley and Eleanor R. Holley to strike the brief of the amicus curiae came too late. The reservation of the "right to challenge the standing of the proponents Chaney in this Court and their right to be heard in opposition to the Assignments of Error and Brief of the said Holleys", can not, in our opinion, authorize the undoing of what they had already done, viz., agree that Mr. Thomason, as attorney for the Chaneys, might file a brief in this cause and be heard in oral argument. That issue is, in any event, a theoretical one, because the brief filed by Mr. Thomason as amicus curiae adds little, if anything, to the brief filed on behalf of Norma Faye Taylor and John A. Taylor by their counsel, Mr. Irving M. Strauch; and, in his oral argument at the hearing, Mr. Thomason merely adopted the argument previously made by Mr. Strauch. The motion to strike the brief of the amicus curiae is therefore denied.

On the merits of this case, the sole question presented in this Court is whether or not the trial judge should have granted, on authority of Wagner v. Niven, 46 Tenn. App. 581, 332 S.W.(2d) 511, the motion for a directed verdict made by Willie Hugh Holley and Eleanor R. Holley at the conclusion of the proof. Appellants' one Assignment of Error presents that issue.

The two suits involved in these consolidated causes resulted from an automobile collision which occurred Sunday morning, October 29, 1961 at about 9:30 A.M. on Halls Road near Humphrey Road in Shelby County, Ten-

nessee. At that time, Norma Faye Taylor, now Norma Faye Taylor Ray, then 16 years of age, was riding on the front seat of a Ford automobile driven by her sister, Eleanor R. Holley, then 19 years of age, when same collided with a Chevrolet automobile driven by Roxie Ann Chaney, wife of Eugene Chaney. The collision occurred at or near the crest of a hill. The Holley car was headed south, and the Chaney car was headed north. After the collision, the two cars came to rest in the center of the road, with the Holley car facing east, and the Chaney car facing west, about two feet apart. Oil and debris in the road also indicated that the collision had occurred at or very near the center of the road. S. M. Blankenship, a deputy sheriff, who investigated the accident, testified that he measured skid marks made by the Chaney car, which extended 14 feet, and were in the center of the road. Each of the drivers, Mrs. Holley and Roxie Ann Chaney, testified that the other was driving on the wrong side of the road.

█ The evidence, taken as a whole, is amply sufficient to sustain the verdict against both pairs of defendants, and no complaint is made as to the amount of the verdicts. Counsel for defendants, Willie Hugh Holley and Eleanor R. Holley, rests their appeal entirely on the contention that the testimony of the plaintiff, Norma Faye Taylor, negatived all allegations of negligence made in her declaration, and, consequently, that, on authority of Wagner v. Niven, 46 Tenn.App. 581, 332 S.W.(2d) 511, the trial judge should have granted the motion for directed verdict made by the Holleys at the conclusion of the proof. Plaintiffs' declarations, which are substantially the same in each of the two cases, allege that Eleanor R. Holley, the driver of the Ford automobile, "was negligent in that she negligently, carelessly and illegally failed to

keep a proper lookout ahead, failed to keep her car under proper control, drove said car at a dangerous and high rate of speed under the circumstances, failed to yield the right of way, failed to keep her car on the proper side of the road, failed to apply her brakes when she saw or in the exercise of reasonable and ordinary care should have seen that a collision was imminent.'' Said declarations also allege violations of sections 59-815, 59-816, 59-821, 59-852, and 59-858, T.C.A.

We quote from the testimony of plaintiff, Norma Faye Taylor, as follows:

''On direct examination by Mr. Strauch

''Q Now, Norma Faye, I want to direct your attention to this Sunday morning, October 29, 1961, and if you will permit me, to the Saturday night prior to that. Where did you spend that Saturday night.

''A With my sister.

''Q Which one?

''A Eleanor Holley.

''Q And is that this young lady here that we have sued in this case?

''A Yes, sir.

''Q You spent the night with her, is that right?

''A Yes, sir.

''Q And you were going to church together the next morning?

''A Yes, sir.

''Q And about what time did you leave her house to go to church?

"A About 9:30.

"Q And she was driving her 1957 Ford automobile that was owned by her husband, Mr. Holley, is that correct?

"A Yes, sir.

"Q Now, when you left the house, tell us who was driving the car.

"A My sister, Eleanor Holley.

"Q Your sister, Eleanor Holley? Now, who was next to her?

"A The baby.

"Q Whose baby was that?

"A My sister's.

"Q Your sister, Mrs. Holley's baby, and about how old was that child?

"A About three months.

"Q And what was that baby in while you were riding?

"A A box.

"Q A box?

"A Yes, sir.

"Q And was that box between you and your sister Mrs. Holley?

"A Yes, sir.

"Q And you were seated on the outside of the car?

"A Yes, sir.

158

"Q And, now, where does Mrs. Holley live? What street is it on?

"A Humphrey Road

"Q And you came up Humphrey Road and got onto Halls Road, did you not?

"A Yes, sir.

"Q Now, when you got on Halls Road, did you make any stops on Hall Road?

"A Yes, sir.

"Q Where did you stop?

"A At Mr. Holley's grandmother's.

"Q Mr. Holley's grandmother? In which direction were you all headed on Hall Road.

"A We were headed north.

"Q And are you sure about that direction?

"A We were headed south.

"Q Well, I mean now—huh?

"A We were headed south.

"Q Don't be scared now. Nobody is going to hurt you. You all stopped at the grandmother's home?

"A Yes, sir.

"Q And how long did you stop there?

"A Just a few minutes.

"Q Did you get out of the car?

"A No.

"Q Did Mrs. Holley get out of the car?

"A No.

"Q Did the baby get out of the car?

"A No.

"Q You all stayed in the car?

"A Yes, sir.

"Q Now, after you left the Davis home, which direction did you all proceed on Halls Road?

"A We kept on.

"Q You kept on. In which direction had you been going?

"A South.

"Q South on Hall Road. Now let me ask you this so the jury will know, Norma Faye. As you go south on Hall Road, is that road level or has it got a rise in there, or just what. Tell the jury.

"A It has got a rise in it.

"Q So if you are going south on Hall Road, can you see very far in front of you?

"A No, sir.

"Q About how far, if you can imagine, how far can you see?

"A Not very far.

"Q Huh? Not very far?

"A No, sir.

"Q How long had it been after you all left Mrs. Davis' before this collision occurred?

"A How long?

"Q Yes, about how much time elapsed?

"A I don't know; we had gone—(interrupted).

"Q Huh?

"A I don't know how long it was.

"Q For a long time or a short time?

"A It was a little short while.

"Q Had she gotten the car going pretty good or not?

"A We had just moved 150 feet when the accident happened.

"Q Well, now, did you see the other car coming?

"A Yes, sir.

"Q Did you holler?

"A I don't remember.

"Q Well, how far was it from you when you first saw it?

"A As soon as we got to the top of the hill.

"Q Was it far away from you there at the time?

"A No, not too far.

"Q Did your sister apply the brakes?

"A No, sir.

"Q Huh?

"A No, sir.

"Q Did she pull the car off the road?

"A Yes, sir.

"Q Huh?

"A Yes, sir.

"Q Well, now, did you all have a collision there?

"A Yes, sir.

"Q Was it a big collision or a little collision?

"A A big one.

"Q How do you know?

"A Because of the way we were hurt."

On cross examination by Mr. McLain, she testified as follows:

"Q I understand you left your sister's home with your sister about 9:30.

"A Yes, sir.

"Q On Sunday morning, is that correct?

"A Yes, sir.

"Q And did the accident happen a few minutes after that?

"A Yes, sir.

"Q It wasn't very long, was it?

"A No, sir.

"Q Where were you all going to church?

"A Collierville Parkland Methodist in Collierville.

"Q Did you all live out in the general neighborhood there?

"A I live in Collierville, yes, sir.

"Q How far were you from the church, do you know in miles?

"A No, sir, I don't.

"Q Now you drive from your sister's—your sister drove from her home on Humphrey Road around to Hall Road and turned and drove south on Hall Road. Is that correct?

"A Yes, sir.

"Q And Hall Road at the scene of the accident is a black top road sufficiently wide for the two cars to travel, one going one way and one the other, and that is about all, is that true?

"A Yes, sir.

"Q There is no center line down the roadway?

"A No, sir.

"Q And I believe you stated that there at the scene of the accident the road is hilly, and you can't see another automobile until you get right up to the crest of the hill either way, is that correct?

"A Yes, sir.

"Q You can't see a car coming and they can't see you from the other side until both vehicles get up close to the crest of the hill, is that correct?

"A Yes, sir.

"Q When you got into the Hall Road, you say that your sister drove around to the home of her husband's grandparents? That is, Mr. and Mrs. Davis?

"A Yes, sir.

"Q Did she come to a full stop there, at the Davis home?

"A Yes, sir.

"Q Is that Davis home on the west side of the road?

"A Yes, sir.

"Q Pardon me?

"A I think so.

"Q You were going south, weren't you?

"A Yes, sir.

"Q Wasn't it on the west side of the road?

"A Yes, sir.

"Q Now, incidentally, did Mrs. Davis come out on the porch?

"A Yes, sir.

"Q And she didn't go to church with you, did she?

"A No, sir.

"Q And her husband wasn't there, was he?

"A No, sir.

"Q And then did Mrs. Davis go back in the house?

"A Yes, sir.

"Q And then your sister pulled off, Eleanor?

"A Eleanor?

"Q Eleanor R. Holley; excuse me, Norma Faye.

"A Yes, sir.

"Q At that time you were on the right hand side of the automobile and the little baby in the middle between you?

"A Yes, sir.

"Q Were you holding the baby with your hand in this little box? Did you kind of look after it?

"A No, sir.

"Q From the time that you left Mrs. Holley's grandparents, or rather her husband's grandparents, or the home of Mr. and Mrs. Davis, up until the time of the accident were there any other automobiles on the road other than your sister's, other than the one in which you were riding and the one driven by Roxie Ann Chaney?

"A No, sir.

"Q No other vehicles were involved?

"A No, sir.

"Q You weren't passing any cars or overtaking any other cars?

"A No, sir.

"Q Just the two vehicles were the only ones out there on the road at the time this accident happened?

"A Yes, sir.

"Q And from the time you left Mrs. Davis' home, up

until the time of the accident, there was no other car involved except your car and the Chaney car?

"A That's right.

"Q You weren't overtaking or passing anybody else?

"A No, sir.

"Q Norma Faye—Excuse me, may I have just a moment, your honor? Norma Faye, you remember on March 6th of 1963 when you went to the office of Mr. Irving Strauch and Mr. Joe Jones in the 81 Madison Building and your discovery deposition was taken by Mr. John Thomason. I was there, and Mr. Charles Cassell, I believe was there and representing you and your father on behalf of Mr. Strauch and Mr. Jones. You remember that, don't you?

"A Yes, sir.

"Q And a lady was there and you were asked questions and you gave certain answers. You remember that?

"A Yes, sir.

"Q You were asked questions at that time about this accident by Mr. Thomason as to what happened, and you gave answers to those questions?

"A Yes, sir.

"Q Were those answers true and correct?

"A Yes, sir.

"Q You were under oath there at that time, were you not?

"A Yes, sir.

"Q They swore you in as a witness, is that correct?

"A Yes, sir.

"Q And you told the truth about the matter at that time, did you?

"A Yes, sir.

"MR. McLAIN: Now, if your honor please, at this time I would like to introduce into evidence and read to the jury the discovery deposition of Norma Faye Taylor Ray, taken March 6, 1963 on the basis of an admission of a party.

"THE COURT: Well, I don't believe this is the proper time to do that. You may introduce it as a part of your proof. At this time you may ask the witness anything you want to with reference to the deposition, but I don't think this is the time to introduce it as a part of your proof.

"MR. McLAIN: I am introducing this as a part of the witness' proof, the plaintiff's proof.

"THE COURT: You may cross examine her about it, but it is not the proper time to introduce it as proof in this case.

"MR. McLAIN: Then I would like to note my exception, and at this time offer for the record the discovery deposition of Norma Faye Taylor Ray as an admission by a party.

"THE COURT: All right. As I say I think the proper time to do it is when you introduce your proof in chief, but you may, of course, inquire of the witness about any statements that she made at that time in the pretrial depositions for the purpose of cross examination.

(Thereupon the discovery deposition taken on March 6, 1963 of Norma Faye Taylor Ray was then marked 'Exhibit 2—Norma Faye Taylor Ray' (excluded)).

"Q Now, Norma Faye, when your sister left the home of Mr. and Mrs. Davis, up until the time of the accident was she on the proper side of the road?

"A Yes, sir.

"Q And when your sister left the home of Mr. and Mrs. Davis, and up until the time of the accident, was your sister watching what she was doing?

"MR. THOMASON: If your honor please, that calls for a conclusion, and we object to it.

"THE COURT: You may ask her whether or not she observed whether she was looking out.

"MR. THOMASON: The question wasn't phrased that way. He asked this witness what her sister was doing, and this sister could only conclude and, therefore, we objected to it.

"THE COURT: She can testify to what she saw. I will sustain the objection to the question to the form in which it was asked. You may ask her what she observed in that connection.

"MR. McLAIN: I would like to be heard on that matter, but to expedite the matter, I would like to move along and then I will come back to it and perhaps at that time we may be in line for a recess or something and we can take it up then.

"THE COURT: All right, sir.

"Q Norma Faye, what did you observe about your

sister in so far as her looking or watching where she was going?

"A Well, from the time we left, up until the time of the accident, she was on her side of the road, but after the accident, I don't know where the cars went or anything.

"Q Well, from the time you left the home of Mr. and Mrs. Davis, up until the time of the accident, state whether or not your sister was keeping a lookout ahead.

"MR. STRAUCH: May it please the Court, I object to that. How can this witness know what her sister was doing. All she knows is what she was doing.

"THE COURT: I will sustain the objection to the form of the question. You may observe her sister doing at that time, but keeping a lookout ahead is normally a conclusion because that involves many things.

"MR. McLAIN: If your honor please, I believe I have reached a point where I will have to take this matter up with the Court.

"THE COURT: All right, I will excuse the jury for about a 10 minute recess.

(Then followed a lengthy discussion before the court, in the absence of the jury, after which the jury returned and the cross examination continued.)

"Q Norma Faye, I understood you to testify earlier that from the time your sister left the home of Mr. and Mrs. Davis, up until the time of the accident, she was at all times driving on the proper side of the road. Is that correct? On her right hand side of the road?

"A Up to the time of the accident?

"Q Yes.

"A Yes, sir.

"Q And when your sister left the home of Mr. and Mrs. Davis, up until about the time of the accident, how fast was she driving?

"A About 20.

"Q Tell the Court and jury whether—first of all, from the time your sister left the home of Mr. and Mrs. Davis, up until the time of the accident, was she looking ahead?

"MR. STRAUCH: If the Court please, just a moment, I object to asking the witness what her sister was doing.

"THE COURT: You may ask her what she observed, as to whether or not she observed whether or not her sister was looking ahead.

"MR. McLAIN: I think the question is proper to ask her where she was looking.

"THE COURT: Overrule the objection.

"MR. STRAUCH: We respectfully note an exception.

"THE WITNESS: I don't know.

"MR. STRAUCH: What was her answer?

"THE WITNESS: I wasn't watching my sister.

"Q (by Mr. McLain) You say you were not watching your sister?

"A No, sir.

"Q Did you observe anything about your sister which would indicate that she was not keeping a proper look-out ahead?

"MR. STRAUCH: We object to that. She says she was not watching her sister.

"THE COURT: I overrule the objection.

"MR. STRAUCH: We respectfully note an exception to your honor's ruling.

"MR. THOMASON: We object to that also.

"Q Did you observe anything about your sister which would indicate that she was not keeping a proper look-out ahead.

"A I wasn't watching her.

"Q Did you see or observe anything about her that would indicate that she wasn't keeping a proper look-out ahead?

"A No.

"Q Now, Norma Faye, from the time your sister left the home of Mr. and Mrs. Davis, up until the time of the accident, how was she driving the car?

"MR. THOMASON: If the court please, that is such a broad statement.

"MR. McLAIN: I will be glad to be more specific.

"THE COURT: All right, sir.

"Q Was your sister from the time she left the home of Mr. and Mrs. Davis, up until the time of the accident driving her car in a straight line forward?

"A Yes, sir.

"Q She didn't lose control of the automobile at any time from the time she left Mrs. Davis' house, up until the time of the accident, did she?

"A No, sir.

"MR. THOMASON: Objection as to whether the driver lost control.

"THE COURT: I will let her answer that.

"MR. McLAIN: She has already answered 'No, sir', isn't that correct?

"THE WITNESS: Yes, sir.

"Q Now, Norma Faye, about how far had your sister gone from the time she left the home of Mr. and Mrs. Davis, up until the time the accident happened?

"A About 150 feet.

"Q Could you see the automobile being driven by Roxie Ann Chaney until you got up near the crest of the hill going south?

"A No, sir.

"Q When you saw the automobile of Roxie Ann Chaney, tell us where it was with respect to the center line of the road, if there had been a center line?

"A Where was she?

"Q Yes

"A In the middle of the road.

"Q Was she over on your sister's side of the road to any extent?

"A Yes, sir.

"Q If there had been a center line down the center of the road, how much was Roxie Ann Chaney's automobile over on your side?

"A About half.

"Q What speed was Roxie Ann Chaney driving, Norma Faye?

"A Before the impact?

"Q Yes, when you saw her.

"A I would say between 60 and 65.

"Q And from the time that you saw Roxie Ann Chaney's car, up until the time of the collision, was that just a flash, a second?

"A Would you repeat the question?

"Q Was it just a brief second from the time you saw Roxie Ann Chaney's car until the time the two cars collided?

"A It was a minute or two, I mean your honor before I saw it.

"Q You say before you saw it, is that right? Is that what you are saying?

"A You mean—(interrupted).

"Q Let me state the question again. From the time you saw Roxie Ann Chaney's car up until the time the collision happened, was that just a flash of a second?

"A Yes, sir.

"Q And during that brief second (counsel snapping fingers), your sister did not have time to apply her brakes?

"MR. STRAUCH: I object to that as a conclusion.

"THE COURT: I will sustain the objection to that.

"MR. McLAIN: Note my exception.

"Q Did your sister have an opportunity to apply her brakes?

"MR. STRAUCH: I object to that as a conclusion.
"Q Did your sister have an opportunity—(interrupted).

"THE COURT: I sustain the objection.

"Q How far away was the Chaney automobile when you first saw it, Norma Faye?

"A When we got to the hill, you mean?

"Q Yes.

"A It was just about on us.

"Q Just about on you?

"A Yes, sir.

"Q Can you put it in car lengths? Can you put it one or more car lengths or less?

"A About two.

"Q About two car lengths, you say?

"A Yes, sir.

"Q And at that time you say your sister was going about 20 miles an hour.

"A Yes, sir.

"Q And at that time you say your sister was going about 20 miles an hour.

"A Yes, sir.

"Q And Roxie Ann Chaney was going about 60 or 65?

"A Yes, sir.

"Q And Roxie Ann Chaney was half way over on your side of the road?

"A Yes, sir.

"Q And what did your sister do when Roxie Ann Chaney's car came into view? Did she swerve one way or the other?

"A The best I can remember, she kept pulling more to her side to avoid the accident.

"Q That is what your sister did?

"A Yes, sir.

"Q You say to her side. You mean to the right side of the road?

"A Yes, sir.

"Q And what did Roxie Ann Chaney do?

"A Nothing.

"Q Did she pull either way?

"A Instead of swerving back on her side, she swerved more over to our side.

"Q In other words, Roxie Ann Chaney cut over further to your side of the road?

"A Yes, sir.

"Q And did the two cars collide?

"A Yes, sir.

"Q Norma Faye, you did not have time to cry out yourself, did you?

"A No, sir.

"Q Did your sister do everything she could to avoid the accident?

"MR. STRAUCH: I object as a conclusion, if your honor please.

"THE COURT: Sustain the objection.

"MR. McLAIN: Note my exception, your honor. I believe that is all."

As part of the proof in chief of Willie Hugh Holley and Eleanor R. Holley, and as authorized by Chapter 54, Public Acts of 1959, secs. 24-1201-24-1209, T.C.A., they introduced in evidence the following questions and answers from the discovery deposition of Norma Faye Taylor, taken March 6, 1963:

"MR. McLAIN: (Reading) Miss Taylor as I understand your testimony, your sister had stopped at a house and proceeded about 150 feet when the accident happened, is that correct?

"A Yes, sir.

"Q And your sister was on her proper side of the road at all times up to the time of the accident?

"A Yes, sir.

"Q And was your sister keeping a proper lookout ahead?

"A Yes, sir.

"Q And as soon as she saw the automobile of Roxanne Chaney, your sister swerved to the right?

"A Yes, sir.·

"Q As far as she could go?

"A Yes, sir.

"Q And did she apply her brakes at that time?

"A I don't remember.

"Q Would you say that your sister did everything she could to avoid this accident?

"A Yes, sir."

Based on the above quoted testimony of plaintiff, Norma Faye Taylor, counsel for Willie Hugh Holley and Eleanor R. Holley contends that, on authority of Wagner v. Niven, 46 Tenn.App. 581, 332 S.W.(2d) 511, their motion for a directed verdict should have been sustained, and that this Court should now reverse and dismiss the cause as to them.

In Wagner v. Niven, where the plaintiff, on cross examination, negatived each and every allegation of negligence alleged in her declaration, this Court held, affirming the judgment of the lower court, that a motion for a directed verdict had been properly sustained. In that case, however, we distinguished its facts from those involved in Buice v. Scruggs Equipment Co., 37 Tenn. App. 556, 267 S.W.(2d) 119, in which case a contrary result had been reached. The distinction was on the ground that conflicting testimony of complainant in the Buice case could be classified under the heading of contradictory statements of a witness which cancelled each other out, but left other competent testimony before the jury sufficient to sustain the verdict, whereas in the Wagner case, the plaintiff's testimony completely negatived each and every allegation of negligence made in

her declaration, and thus, by application of the principle of judicial estoppel, deprived her of the right to a recovery.

From the opinion of this Court, Eastern Section, written by Howard, J., denying a petition to rehear in the case of Buice v. Scruggs Equipment Co., we quote, as follows:

"Thus we conclude that the complainant's alleged contradictory testimony was not fatal, as there was other credible evidence to support his contention that the contract was made in April or the 'spring' of 1951.

"The rule is well established in this state that where an interested party in his testimony makes a material statement of fact negativing his right of action or defense, and no more favorable testimony appears, he is bound by it. Johnston v. Cincinnati, etc., Ry. Co., 146 Tenn. 135, 157, 240 S.W. 429; Harris & Cole Bros. v. Columbia Water & Light Co., 114 Tenn. 328, 341, 85 S.W. 897; McLemore v. Charleston & M. R. Co., 111 Tenn. 639, 69 S.W. 338. However, where there is an explanation, or as here, where other credible evidence is presented, the weight and credibility of the negative testimony becomes a question for the determination of the jury and cannot be determined by the court as a matter of law. See Annotations 80 A.L.R. 627; 169 A.L.R. 798." Buice v. Scruggs Equipment Co, 37 Tenn. App. 582-583, 267 S.W.(2d) 131.

██ ██ In the case at bar, the testimony of plaintiff, Norma Faye Taylor, given before the Court and jury, is not completely inconsistent with all of the allegations of negligence in her declaration. Her testimony, which was more inconsistent with the allegations of her declaration

than her testimony at the trial, was given in her pretrial discovery deposition, and was presented to the jury in the instant case as part of the proof of defendants. It was within the province of the jury to decide which, if either, version of plaintiff's testimony it would believe. Therefore, our conclusion is that the instant case is controlled by Buice v. Scruggs Equipment Co., 37 Tenn.App. 556, 267 S.W.(2d) 119, rather than by Wagner v. Niven, 46 Tenn.App. 581, 332 S.W.(2d) 511. Even though the jury may have seen fit to disregard entirely the testimony of plaintiff, Norma Faye Taylor, there was other evidence in the record amply sufficient to justify a verdict in her favor. The conclusion, thus reached, is, also, in harmony with the unreported opinion of this Court, Western Section, in the case of Lamon Harvey and United Taxi Co., Inc. v. Hortense Stewart, filed June 24, 1959.

It results that the Assignment of Error filed in this cause by appellants, Willie Hugh Holley and Eleanor R. Holley, will be overruled and the judgment of the lower court affirmed at the cost of said appellants and their surety on the appeal bond.

Avery, P.J., (W.S.), and Carney, J., concur.